488 So.2d 726 (1986)
Charles LANDRY, et ux., Plaintiffs-Appellees,
v.
NOBILITY HOMES, INC., et al., Defendants-Appellants.
No. 85-143.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1986.
Writ Denied July 1, 1986.
*727 Young & Burson, H. Kent Aguillard, Eunice, for defendant-appellant-appellee.
Hill & Leavoy, Leslie R. Leavoy, Jr., Alexandria, for defendant-appellee-appellant.
Lawrence Roe Dodd, Baton Rouge, Pucheu & Pucheu, Jacque B. Pucheu, Jr., Eunice, for plaintiffs-appellees.
Before GUIDRY and FORET, JJ., and HOOD, J. Pro Tem.

MOTION TO DISMISS SECOND AMENDED ANSWER
WARREN E. HOOD, Judge Pro Tem.
Defendant-appellant, Nobility Homes, Inc., (Nobility), filed a motion to dismiss the second amended answer to appeal filed by plaintiffs-appellees, Charles and Pandora Landry, (Landry), on the grounds that it was filed untimely and that defendant-appellant had not had adequate time to prepare a response to the amended answer.
The procedural background of this appeal is as follows. The record in this case was lodged in the Court of Appeal on February 6, 1985. Both Nobility and Ed's Manufactured Housing, Inc., (Ed's), had appealed.
On February 14, 1985, Landry filed an answer to the appeals, praying for 1) an increase in the amount of damages awarded in the judgment against Ed's, and 2) an increase in the attorney's fees awarded Landry in the judgment against Nobility.
Also within fifteen days from the date of the lodging of the appeal, Landry, on February 21, 1985, filed an amended answer to the appeals. The amending answer prayed for an increase in the attorney's fees against Nobility for additional work done on appeal as was prayed for in the original answer. However, in this answer, Landry prayed that the judgment of the trial court otherwise be affirmed, thereby deleting appellee's request for an increase in the judgment against Ed's.
On May 31, 1985, Ed's filed with this court its "original notice of consent and agreement on behalf of Ed's Manufactured Housing, Inc., appellee and appellant." In this notice, Ed's stated that it agreed with plaintiffs' (Landry) position in this case in every respect. The filing of this notice of consent effectively renders Ed's appeal moot.
On March 12, 1986, five days before oral argument, plaintiffs filed their second amended answer. In their amended answer, they prayed 1) that the amount of damages awarded be increased from $12,813.19 to $20,000.00, 2) that the award of attorney's fees be increased from $2,500.00 to $5,000.00, and 3) that judgment be rendered in favor of Landry and against Ed's and Nobility, jointly, severally and in solido, for all sums awarded as damages. (The judgment of the trial court had not rendered a joint, several and in solido judgment.)
*728 We are aware of appellate court decisions that have permitted appellees to file amended answers more than fifteen (15) days after the return date or the lodging of the record, whichever is later. We are particularly aware of the decision of this circuit in Fogleman v. Roy O. Martin Industries, Inc., 432 So.2d 1197, (La.App. 3rd Cir.1983). While the facts of this case are easily distinguishable from the facts of the cases referred to, justifying a granting of the motion to dismiss, we prefer to base our decision to grant the motion on our interpretation of Code of Civil Procedure Article 2133.
We believe the plain wording of CCP 2133 requires the appellee's answer, which is equivalent to an appeal on his part, to be filed not later than fifteen (15) days after the return date or the lodging of the record, whichever is later. No provision is made for a later filing of an amended answer. There being no statutory authority permitting an appellee to seek relief by appeal beyond the fifteen (15) day period, the motion to dismiss must be granted. We note that appellee suffers no prejudice by being required to timely file his answer, as well as any amendments thereto, within the fifteen (15) day period, since ample time has elapsed since the rendition of judgment and the lodging of the appeal for him to decide what relief, modification or revision that he wishes in the judgment.
We hold that no answer or amended answer to an appeal, demanding relief, will be permitted and considered, if filed more than fifteen (15) days after the return date or the lodging of the record, whichever is later.
Accordingly, the only issue raised by appellees that will be considered on this appeal is their prayer that the judgment rendered in their favor and against Nobility for attorney's fees be increased.
MOTION GRANTED.

MERITS
This is an appeal from a judgment in the district court rescinding the sale of a mobile home, cancelling the consumer credit sales contract and awarding damages plus attorney's fees.
The plaintiffs, Charles and Pandora Landry, purchased a mobile home from Ed's Manufactured Housing, Inc., (hereinafter referred to as "Ed's"). The mobile home was manufactured by Nobility Homes, Inc., (hereinafter referred to as "Nobility"). In connection with the sale, the plaintiffs entered into a pre-arranged credit sales contract with the seller who in turn assigned the note and mortgage to Green Tree Acceptance, Inc., (hereinafter referred to as "Green Tree"). Soon after delivery to their property in the country, the Landrys began to experience numerous problems with the mobile home.
When the seller and manufacturer were unable to satisfactorily repair the problems, the plaintiffs brought suit against Ed's, the seller, Nobility, the manufacturer, and Green Tree, the holder of the note and mortgage on the mobile home. Green Tree answered, reconvened against the plaintiffs, and filed a third party demand against Ed's and Nobility for indemnification should the plaintiffs prevail in their main demand. Ed's also answered and filed a third party demand against Nobility seeking indemnification for any damages it may have to pay to the plaintiffs. Nobility answered and attempted to file a reconventional demand against Ed's during the trial but was not granted leave by the trial court to do so.
After the testimony of various witnesses and a personal inspection of the mobile home by the trial judge, judgment was rendered in favor of the plaintiffs and against 1) Ed's, rescinding the sale of the mobile home; 2) Ed's, in the sum of $12,541.50, being the amount of plaintiff's monthly note of $446.75 for eighteen (18) months; 3) Nobility in the sum of $2,500.00 as attorney's fees; 4) Green Tree, cancelling any and all liability under the promissory note held by Green Tree.
Judgment was further rendered in favor of Ed's on its third party demand against Nobility in the sum of $12,541.50 and for *729 $2,500.00 for attorney's fees, as indemnification of Ed's payment to plaintiffs.
Judgment was further rendered in favor of Green Tree and against Ed's for $25,725.00, being the amount of the cancelled consumer credit contract.
Thereafter, a new trial was granted, but the evidence was limited to the record of the first trial.
With regard to the motion for new trial filed by the Landrys against Ed's, Green Tree and Nobility, and with regard to the motion for new trial filed by Green Tree of its third party demand against Ed's and Nobility Homes, the parties stipulated that judgment should be rendered, and judgment was so rendered, 1) in favor of plaintiffs and against Ed's rescinding the sale of the mobile home; 2) in favor of plaintiffs and against Ed's in the amount of $12,813.90; 3) in favor of plaintiffs and against Nobility in the amount of $2,500.00 as attorney's fees; 4) in favor of plaintiffs and against Green Tree, cancelling any and all liability under the promissory note made payable to Ed's and assigned to Green Tree; 5) in favor of Green Tree and against Ed's in the sum of $27,097.16, representing the amount of the cancelled consumer credit contract.
It was further stipulated that the new trial would be limited to the claims between Ed's and Nobility.
Following the new trial, the trial court further rendered judgment:
"In favor of ED'S MANUFACTURED HOUSING, INC., and against NOBILITY HOMES, INC., in the sum of THIRTY NINE THOUSAND NINE HUNDRED ELEVEN AND 06/100 ($39,911.06) with legal interest thereon from the date of judicial demand until paid and for TWO THOUSAND FIVE HUNDRED AND NO/100 ($2,500.00) as attorney's fees with legal interest thereon from April 19, 1984 until paid."
All costs were assessed to Nobility. The judgment further recited that Nobility must receive and collect the mobile home from its present location into its own care and custody, with all costs of said collection of the mobile home to be borne by Nobility.
The trial judge handed down detailed reasons for judgment after both the original and new trial of this matter. The facts, as summarized by the trial judge in his original opinion, are as follows:
"On April 28, 1982 plaintiffs purchased a mobile home from Ed's. The mobile home had been manufactured by Nobility and was sold to Ed's approximately one (1) year prior to plaintiffs' purchase. The purchase price was THIRTY THOUSAND TWO HUNDRED TWENTY FIVE DOLLARS ($30,225.00). Plaintiffs made a down payment of FOUR THOUSAND FIVE HUNDRED DOLLARS ($4,500.00) representing the value of their old mobile home which they traded to Ed's. They signed a promissory note for the balance which provided for monthly payments of FOUR HUNDRED FORTY SIX DOLLARS AND SEVENTY FIVE CENTS ($446.75) beginning June 1, 1982. This note was financed by Ed's, who assigned the note and mortgage under a pre-arranged credit arrangement with Green Tree. The home was delivered to plaintiffs' lot in Acadia Parish, Louisiana, near the city of Eunice.
"Shortly after the delivery of the home, Mrs. Landry encountered the following problems, to-wit:
(1) Water entered their home.
(2) A one (1) inch bow in the wall in the kitchen.
(3) A chipped oven door.
(4) Torn linoleum in the kitchen and bathroom.
(5) All of curtains and sheers were dry-rotted.
(6) The carpet in the corner of the living room by the fireplace was improperly installed, and
(7) The windows were jammed and would not open.
"She contacted Ed's and Nobility, informed them of her problems and requested the repair of the same. Ed's sent its employee, Danny Mertens to plaintiffs' home. He made six (6) visits to do repair *730 work. His first visit was on May 7, 1982. At that time he found the following:
(1) Water damage to the carpet in the living room and northwest bedroom.
(2) Door lock problems.
(3) Fireplace was damaged in several places.
(4) Northwest front bedroom vent was not emitting enough air to cool or heat it.
(5) All of the sheers and curtains were dry-rotted.
(6) There were no tie-backs for the curtains.
(7) Fireplace doors were rusted.
(8) Formica on kitchen counter was chipped.
(9) A wall in the kitchen was bowed out two and a half (2½) to three (3) inches.
(10) There were no carpet stripping metal which was needed between doors.
(11) Linoleum in kitchen was torn.
(12) Four (4) windows would not open nor close.
(13) Oven door on stove in kitchen was chipped.
(14) Some molding was broken.
"Mr. Mertens' subsequent visits were on June 8, 1982, July 22, 1982, July 28, 1982, July 30, 1982 and September 24, 1982. During those visits he testified that he noticed that water was entering through the front door of the home into the living room, and from there extended into the adjoining northwest bedroom as well as the fireplace. He attempted to place stripping around the front door to eliminate the leakage but was not sure exactly where the water was entering the home. As late as September 24, 1982 he observed the interior of the living room and northwest bedroom and found that the carpet was wet but he also found staple holes in the roof which he thought might have allowed the water to enter the interior of the home. He sealed approximately a couple of hundred holes in the roof at that time. He further testified that Nobility was aware of these problems but did not install a storm door.
"Plaintiffs continued to experience water damage to such an extent that the water caused a hole in the living room floor where the front door opens into the living room. This required them to cover the hole with a piece of plywood in order to prevent anyone stepping into the hole when entering through the front door. They also contacted Nobility about their problems, who sent Bill Briley in June, 1982 to inspect the home. Mr. Briley, who was not called as a witness to testify, apparently observed the water damage and simply put weather stripping on the front door. Mr. Landry requested a storm door but Nobility refused to install one until sometime in February, 1984, after suit was filed by plaintiffs. At that time a storm door was installed and there has been no further leakage in the home but the following problems have remained; apparent faulty wiring, sagging of the floor in the kitchen, a slight bow in the wall in the kitchen, the fireplace does not operate properly, the air condition vent in the northwest bedroom does not heat or cool the same, there is a one (1) inch sag in the roof above the living room and northwest bedroom which runs to the fireplace vent thereon and there is an odor when the central unit is operating. The repairs in February were made without prejudice to the rights of plaintiffs in their suit for a rescission of the sale.
"Mr. Byron Cart, who was qualified and accepted as an expert in general building construction and repair, testified that on February 14, 1983, he inspected the mobile home of plaintiffs and found water damage due to leakage. He could not determine the exact place that the leakage occurred but he considered that the water entered the house through the front door and possibly through the roof down the fireplace. He also noted on another visit about a one (1) inch sag in the roof. There was also noticeable water damage to the floor which was presswood and he recommended that the entire roof should be replaced to prevent leaks in the bathroom, fireplace, living and bedroom, and that all of the paneling in the northwest bedroom should be replaced because the bottom of eight (8) sheets of *731 paneling were wet and damaged, as was the carpet and some of the floor in the room.
"Larry Miller, an electrician, visited the home on December 9, 1983 and found the following:
(1) Wires were connected incorrectly in the hall light.
(2) The light in the master bedroom needed fixing.
(3) There was an inoperative, or "dry" electrical receptacle which was shorted out, and
(4) There was a loose connection in the panel box.
"He fixed the above and charged the plaintiffs ONE HUNDRED TEN DOLLARS ($110.00) which they paid.
"He further stated that he should change the wire and circuit breaker, which would cost roughly TWO HUNDRED TWENTY DOLLARS ($220), because the wire which was originally installed by Nobility was too small for the breaker. However, this work has not been performed.
"Mr. Joseph T. Bellard, an employee of C.C. Mobile Air, which installs air conditioning units for mobile homes, visited the home on July 29, 1982 where he saw water leakage into the home. On March 26, 1984 he examined the air conditioning unit vent in the northwest bedroom of the house and found that the pressure in the grill was lower than in the other areas of the house, and recommended that the duct be replaced in order to properly heat and cool the room, at a cost of TWO HUNDRED SIXTY SEVEN DOLLARS AND SEVENTY FIVE CENTS ($267.75).
"Mr. Charles Landry substantiated the complaints testified to by his wife. He stated that the defects made it extremely inconvenient for them to occupy the mobile home because they had to rearrange the furniture, and they experienced two (2) fires in connection with faulty wiring, which caused them great concern for the safety of themselves and their daughter. He further testified that they suffered embarrassment because they could not entertain their friends in their living room without the presence of a piece of plywood covering the hole therein.
"Mr. Landry testified that they made eighteen (18) payments on the note and that they tendered the mobile home and asked for a return of their money on February 22, 1983.
"Nobility called as its witnesses Carlton Williams, its general manager since February, 1983 and Ralph W. Wilhite, an employee of Nobility who did the repairs to plaintiffs' mobile home on February 15, 1984. Mr. Williams made two (2) visits to the home of plaintiffs, one in September, 1983 and another in February, 1984. When he inspected the home in September he found water damage, which in his opinion was caused by water entering the living room from the front door, which Nobility had installed. The front door allowed water to run into the living room and damage the carpet and floor therein and in the northwest bedroom. He determined that the home needed a storm door to correct the leakage but he was not permitted by his company to install one until February, 1984. He further stated that he saw no evidence of leaks in the ceiling nor the roof, but on personal observation by the Court, there were water stains in the ceiling of the bathroom, which would indicate to the contrary. In addition, defendant exhibit 10-N, an inter-office memo contained in Nobility's business records, contains a statement of a Mr. Croam, who was a previous general manager of Nobility, who visited the home of plaintiffs and indicated that the water damage could have resulted from leaks in the roof rather than from the front door.
"Mr. Wilhite did numerous repairs to plaintiffs' home on February 15, 1984, which included installing a storm door, replacing damaged carpet and repairing the fireplace to prevent leaks. Although he stated that he examined the roof thoroughly and that there were no holes, loose shingles nor sway or depression in the roof, this is definitely contrary to the Court's personal observation of the roof from *732 which one can easily see a noticeable sway or sag of at least one (1) inch.
"Mr. David L. Aymond, employed in the Louisiana State Fire Marshall's office, Mobile Home Division, testified that upon request of Nobility he inspected the mobile home of plaintiffs on April 5, 1983 and made the following observations:
(1) There was a one-fourth (¼) inch sag in the kitchen floor.
(2) A wall in the kitchen was bowed out.
(3) It was possible that electrical conductors were not secured.
(4) There was leaking in the home in the living room where the floor and carpet and pad had started to deteriorate. This wet condition followed the front door along the front wall and into the northwest bedroom.
(5) There was a leak in the ceiling in the front bathroom which appeared to come from a vent, as there was a stain thereon.
(6) There was insufficient or negligible flow of air in the vent in the northwest bedroom, and
(7) There was a three-quarter (¾) to one (1) inch sag in the roof.
Mr. Aymond mailed a copy of his findings and report to Nobility as well as to the plaintiffs."

* * * * * *
".... The leaks, together with the noticeable sags in the roof and floor in the kitchen, improper operation of the fireplace which caused the smoke to enter the interior of the home rather than go up the fireplace vent, the failure to cool and heat the northwest bedroom, as well as the serious electrical problems, taken together, constitute in the Court's opinion redhibitory defects of such a nature that no one, including the plaintiffs, would have purchased the mobile home had they known of the defects."
As mentioned earlier, the trial court rendered judgment in favor of the Landrys and against the various defendants in addition to rendering judgment in favor of Green Tree and against Ed's and in favor of Ed's and against Nobility. A new trial was granted, but no new evidence was introduced and the only question at issue was, between Ed's and Nobility, who was responsible for the redhibitory defects?
In his REASONS FOR JUDGMENT rendered after the new trial, the trial judge ruled:
"As this Court has stated, the several problems, taken together, constitute redhibitory defects sufficient to rescind the sale. The Court can come to no other conclusion but that the various defects, taken together and caused by the manufacturer, are not so easily remediable by the dealer as to preclude indemnity from Nobility. Therefore, Ed's as a good faith seller, not at fault in creating the defects or in failing to cure easily remediable defects, is entitled to indemnity from the manufacturer, Nobility, for $12,813.90 that Ed's must pay to Charles and Pandora Landry, and for $27,097.16 that Ed's must pay to Greentree Acceptance Corporation, for a total indemnification of $39,911.06."
The issues presented by the Specifications of Error can be summarized as follows:
1. Are the defects sufficient to warrant rescission of the sale?
2. Who is responsible for these defects?
3. Is Nobility entitled to a credit for the Landrys' use of the mobile home?
4. Should the award for attorney's fees to plaintiffs be increased?

REDHIBITION
Redhibition is defined as "the avoidance of a sale on account of a vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." C.C. art. 2520.
In order for a purchaser to prevail in an action for redhibition he need only prove a defect in the thing sold which "renders it either absolutely useless, or its use so inconvenient and imperfect, that it must *733 be supposed that the buyer would not have purchased it, had he known of the vice." Prince v. Paretti Pontiac, Inc., 281 So.2d 112 (La.1973). A purchaser who sues for rescission of the sale may, in the alternative, be awarded a reduction in the purchase price. C.C. art. 2543.
The first error alleged by Nobility was that the mobile home did not contain redhibitory defects sufficient to warrant rescission of the sale. Nobility has cited several cases wherein minor defects formed a basis for reduction of sale price but not rescission of the sale. In Coleman v. Landry & Turner, Inc., 423 So.2d 41 (La.App. 1st Cir.1982), the court concluded that loose moldings, crooked walls, leaky doors, scratched ceiling panels and cold air drafts established only a partial failure of consideration and did not render the mobile home useless or its use so inconvenient to justify rescission of the sale. Another case cited by Nobility was Ark-La-Tex Builders & Realty, Inc. v. Hoge, 344 So.2d 90 (La. App. 2d Cir.1977), in which the court made a factual determination that the water leakage in the travel trailer did not warrant rescission. In Ark-La-Tex Builders & Realty, supra, the plaintiffs' own expert testified that after partial renovation of the trailer by the manufacturer, the leakage problems could be permanently repaired for $350. Finally, the case of Trigg v. Camper Village, Inc., 424 So.2d 1085 (La. App. 1st Cir.1982), only gives examples of minor defects, but the court ordered the sale rescinded due to a major defect of warping floors in the mobile home.
The problems with the Landrys' mobile home are similar to those found in Musemeche v. G & J Mobile Home Service & Supplies, 425 So.2d 791 (La.App. 3d Cir. 1982). In Musemeche, supra, water leakage, among other problems, led to rescission of the sale of a mobile home. Gonzales v. Southwest Mobile Homes, Inc., 309 So.2d 780 (La.App. 3d Cir. 1975) also dealt with a sale of a defective mobile home being rescinded due to various problems including water leakage around doors and windows.
The determination whether the mobile home was redhibitorily defective and, if so, the appropriate remedies available to the parties are factual conclusions which the Courts of Appeal will not disturb unless such is clearly wrong or manifestly erroneous.
The trial judge in the present case found that several problems, especially those arising from the water leakage, combined to constitute redhibitory defects sufficient to rescind the sale. Furthermore, the trial court in the Reasons for Judgment given after the new trial specifically found the defects not easily remediable. He not only observed all the witnesses testify, but he also had an opportunity to personally inspect the Landrys' mobile home. After reviewing the record of the evidence and testimony presented at trial, this court can not find any indication that the trial judge clearly erred in his factual conclusions. Accordingly, these conclusions will not be disturbed since they are not clearly erroneous.

RESPONSIBILITY FOR DEFECTS
Another error alleged by Nobility, which also served as the basis for granting the new trial, concerns the issue of who is responsible for the defects in the Landrys' mobile home.
In the original Reasons for Judgment, the trial judge ruled:
"Since the evidence indicates that the defects in the home at the time of the sale were of such a nature as not to be observable by ordinary inspection, Ed's is found to be a good faith seller and is bound only to restore the purchase price and corresponding expenses of the sale."
Therefore, Ed's was awarded full indemnification from Nobility since Nobility, as manufacturer, was considered a bad faith seller who knew of the defects in the thing it manufactured.
After the new trial, the trial judge made the following findings:
"More specifically, Nobility contends that Ed's failed to caulk or seal the roof while *734 the home was in its possession, as recommended in the owner's manual, and that Ed's failed to order or install a storm door to prevent further water infiltration. Nobility urges that because the defects were easily remediable, and because Ed's failed to remedy the problems, Ed's should be denied indemnity against Nobility, pursuant to La.C.C. Art. 2531.
"No evidence was presented during the trial of this case to establish that Ed's was negligent in maintaining the home while in Ed's possession, save for the unsupported allegation that Ed's failed to seal the roof at least once a year, as recommended by the owner's manual, and the allegation that Ed's failed to install a storm door, either before or after the sale. As this Court stated in its original reasons for judgment, in pertinent part:
`There was no evidence to support the contention that Ed's created the defects while the home was in Ed's possession. On the contrary, and more specifically, it is more probable that the nail holes in the roof which were discovered were the result of the employees of Nobility who nailed visqueen on the roof, in order to transport the same to Ed's. I also do not find any merit to the contention of Nobility that the water leakage could just as easily have been repaired by Ed's as Nobility because neither Ed's nor Nobility knew the cause of the leaks until apparently sometime in September of 1983, when Mr. Williams determined that it was due to the lack of a storm door.'
Further, Nobility did not permit Mr. Williams to install a storm door until February, 1984."
* * * * * *
"..., the Court finds that the cause of water damage, and the proper method to repair the same, were not easily determinable nor easily remediable."
Louisiana Civil Code Article 2531 provides a seller in good faith a right of action for indemnity against the manufacturer. That article provides, in the second paragraph:
"In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect."
This right of indemnity has been qualified by jurisprudence which denies the seller indemnity if the manufacturer proves either the defect did not exist at the time the dealer acquired the thing or the defect was easily remedied but not repaired by the seller. Leonard v. Daigle Pontiac-Buick-GMC, Inc., 413 So.2d 577 (La.App. 1st Cir.1982). If a seller is dilatory in repairing minor problems or problems which are easily remediable, these problems may become redhibitory defects through the dereliction of the seller. See Daigle v. Robinson Brothers, Inc., 368 So.2d 186 (La.App. 1st Cir.1979). It would be unfair to require the manufacturer to accept return of a defective thing and pay costs of the sale plus attorney's fees if the suit in redhibition resulted from the seller's failure to fulfill his obligation to the manufacturer to cure easily repaired defects. Perrin v. Read Imports, Inc., 359 So.2d 738 (La.App. 4th Cir.1978).
On the issue of Ed's claim for indemnity against Nobility, this Court finds no error in the conclusion of the trial judge.

CREDIT FOR USE
Nobility also appealed the failure of the trial court to grant it a credit for the Landrys' use of the mobile home. In its original Reasons for Judgment, the trial court briefly addressed the issue of credit for use:

*735 "Although Nobility alluded after trial to a contention that it should be given credit for the time that plaintiffs occupied the home in the event of a rescission of the sale, there was no evidence as to the rental value of such a home, and even had such evidence been presented, I find that the plaintiffs' use and occupancy of the home was so inconvenient due to the leakage, hole, etc. that any credit due would be offset by plaintiffs' great inconvenience."
The object of the codal articles governing redhibition is to restore the purchaser and seller, as much as possible, to their positions prior to the sale. When a court orders a sale rescinded due to redhibitory defects, the seller returns the purchase price and the purchaser returns the thing sold. In addition to the purchase price, the seller may be required to return any interest he may have earned on the purchase price. The seller may also be entitled to a credit for the purchaser's use of the thing while in the purchaser's possession.
This credit for use may even be awarded to a seller who is in bad faith. Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978). The Louisiana Supreme Court in the Alexander case had to determine whether a credit for use was due a seller of a defective computer system and the amount of the credit. A credit for use should not be automatically granted since the value of extensive use by the purchaser may be overriden by the great inconveniences incurred due to the defects and constant interruptions in service caused by the seller's attempts to repair the thing sold. The granting of a credit for use is within the trial court's discretion. DeBlieux v. Arkla Industries, Inc., 390 So.2d 233 (La. App. 3d Cir.1980).
Just as in Alexander, supra, and Musemeche, supra, the trial court in the present case found that the inconveniences caused by the defects in the Landrys' mobile home outweighed any credit for use Nobility would be entitled to receive.
The trial court also correctly noted, in rejecting the claim for credit for use, that no evidence was presented concerning the rental value of the mobile home. The usual method of calculating the amount of the credit for use has been to use the fair rental value of comparable mobile homes in the area. The case of Rozas v. Eunice Implement Co., 460 So.2d 729 (La.App. 3d Cir.1984) has been cited as an example of a trial court allowing a credit for use without any evidence presented to support such an award. However, in Rozas, supra, the Court of Appeal rejected the trial court's method of calculating the credit for use based upon 20% of the purchase price less the trade-in price and depreciation. Furthermore, the Court of Appeal, citing Capitol Leasing Corp. v. Hill, 404 So.2d 935 (La.1981), found no credit should have been awarded due to the inconvenience and expense caused to the plaintiff.
As stated previously, the determination of issues of fact are within the duty of the trial judge; and after a review of the record, no error can be found in not allowing Nobility a credit for the plaintiffs' use of the mobile home.

ATTORNEY'S FEES
The plaintiffs have appealed for an increase in attorney's fees for additional services rendered on appeal. An increase of $500.00, to a total of $3,000.00, will be granted; and to this extent, the judgment of the trial court is amended.
In all other respects, the judgment of the trial court is affirmed. Costs of this appeal to be assessed to Nobility.
AFFIRMED AS AMENDED.
GUIDRY, J., concurs and assigns written reasons.
GUIDRY, Judge, concurring.
In this case we determine that plaintiffs' second amended answer to the appeals by Ed's Manufactured Housing and Nobility Homes, filed long after the fifteen day delay allowed by La.C.C.P. art. 2133, comes too late and should be dismissed. In Fogleman *736 v. Roy O. Martin Industries, Inc., 432 So.2d 1197 (La.App. 3rd Cir.1983), a different panel of this court held to the contrary. I was a member of the panel which rendered the decision in Fogleman, supra. After further consideration of the issue presented, and with due deference for the opinions of the other members of the Fogleman panel, I now conclude that this court's decision in Fogleman, supra, was error.
In Fogleman, supra, we concluded that there is no statutory law concerning the timely filing of amended answers to appeals. I now disagree. Although an answer filed by an appellee is equivalent to an appeal, unlike an appeal, La.C.C.P. art. 2133 requires that the appellee's answer state with specificity the relief demanded, i.e., the extent to which he seeks modification, revision or reversal of the judgment and/or if he demands damages against the appellant. The cited article further requires the filing of an answer not later than fifteen days after the return day or the lodging of the record, whichever is later. In my view, the language of La.C. C.P. art. 2133 is clear and precise and does not contemplate the filing of supplemental answers, following lapse of the allowed delay, seeking relief additional to that demanded in a timely filed original answer or supplemental answer. In my view, La.C. C.P. art. 2133 is the statutory authority which we found lacking in Fogleman, supra. For these reasons, I respectfully concur.